# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNNESOTA

---

**Fred Mitschele**, an individual;
**Jason Mitschele**, an individual;
and **Michael Minor**, an individual;

      Plaintiffs,

      v.

**Municipal Parking Services,
Inc.**, a Minnesota corporation;
**Travis Carter**, an individual;
**Joseph Caldwell**, an individual;
**Mark Evenstad**, an individual;
**Richard C. Gage**, an individual;
**Thomas G. Hudson**, an individual;
**Tony Jacobson**, an individual;
**Kurt Lange**, an individual;
**Thomas Lowe**, an individual
**Robert G. Parish**, an individual;
**Robert Samson**, an individual; and
**Does 1 through 10**;

      Defendants.

Civil No. <u>18-CV-878</u>

**Complaint
(Jury Trial Demanded)**

---

## I.   Introduction

1.     Plaintiffs invented and licensed a system of advanced, solar-powered, parking meters. After an initial venture to commercialize the technology was unsuccessful, some of the board members of the unsuccessful venture sought to launch a new venture, Defendant Municipal Parking Services, Inc. ("MPS"). MPS was formed in 2009. In 2010, Plaintiffs and MPS reached an agreement for MPS to license and deploy Plaintiffs' intellectual property.

2.     Following the agreement, Plaintiffs and MPS negotiated several amendments. Many of the negotiations related to MPS's requests for short-term financial concessions and rescheduling of contracted-for payments to support MPS's overall, sustained success. The parties' most recent amendment was dated October 2012. The agreements and all relevant amendments are set forth in further detail below.

3.     Subsequently, MPS breached the parties' agreement. Additionally, it breached its fiduciary duties to Plaintiffs, by, among other things, knowingly making false representations to Plaintiffs to induce them to sell their shares back to MPS at a discount.

## II.   Jurisdiction and Venue

4.     This Court has diversity jurisdiction over all claims alleged in this Complaint pursuant to 28 U.S.C. § 1332(a)(2). Plaintiffs are Canadian citizens, and Defendants are United States citizens.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), all Defendants being Minnesota residents.

## III.  Parties

### A.     Plaintiffs

6.     Plaintiff Fred Mitschele is a Canadian citizen currently residing in Bangkok, Thailand.

7.     Plaintiff Jason Mitschele is a Canadian citizen currently residing in Toronto, Canada.

8.     Plaintiff Michael Minor is a Canadian citizen currently residing in Toronto, Canada.

### B.     Defendants

9.     Defendant Municipal Parking Services, Inc. ("MPS") is a company incorporated pursuant to the laws of the State of Minnesota, with its principal place of business at 12450 Wayzata Boulevard, Suite 200, Minnetonka, Minnesota.

10.    Defendant Travis Carter, on information and belief, is an individual currently residing within the State of Minnesota.

11.     Defendant Joseph Caldwell, on information and belief, is an individual currently residing within the State of Minnesota. Caldwell is a co-founder of MPS, previously served as its Chief Executive Officer, and currently serves as a director.

12.     Defendant Mark Evenstad, on information and belief, is an individual currently residing within the State of Minnesota. Evenstad currently serves as a director of MPS.

13.     Defendant Richard C. Gage, on information and belief, is an individual currently residing within the State of Minnesota. Gage is a co-founder of MPS, and currently serves as a director.

14.     Defendant Thomas G. Hudson, on information and belief, is an individual currently residing within the State of Minnesota. Hudson currently serves as the chairman of the board of directors of MPS.

15.     Defendant Tony Jacobson, on information and belief, is an individual currently residing within the State of Minnesota. Jacobson currently serves as a director of MPS.

16.     Defendant Kurt Lange, on information and belief, is an individual currently residing within the State of Minnesota. On information and belief, Jacobson currently serves as a director of MPS.

17.     Defendant Thomas Lowe, on information and belief, is an individual currently residing within the State of Minnesota. Lowe currently serves as a director of MPS.

18.     Defendant Robert G. Parish, on information and belief, is an individual currently residing within the State of Minnesota. Parish currently serves as a Director of MPS.

19.     Defendant Robert Samson, on information and belief, is an individual currently residing within the State of Minnesota. Samson currently serves as a Director of MPS.

## IV.  Factual Background

20.     Fred Mitschele ("Fred"), Jason Mitschele ("Jason"), and Michael Minor ("Michael") (collectively, "Plaintiffs") are inventors with a shared passion for developing state-of-the-art technology that improves business operations, increases efficiency, and aids in important data collection.

21.     Recognizing a unique opportunity to utilize wireless technology within the parking industry, Fred invented and patented certain technology related to a parking meter system its handheld unit technology. The system incorporates digital cameras, internet connectivity, touchscreens, and other features to allow for seamless parking and payment from the consumer perspective, as well as increased parking enforcement efficiency from the municipality perspective. Fred, Jason, and Michael were the lawful and sole

4

owners of the patents and patent applications related to this technology (the "Intellectual Property," as defined in the Original Agreement).

22.     Defendant MPS makes, uses, sells, or licenses a system with a parking meter and digital camera to monitor for parking violations. It makes, uses, sells, or licenses this system worldwide.

23.     MPS's Board of Directors includes: Travis Carter, Thomas G. Hudson, Joseph Caldwell, Mark Evenstad, Richard C. Gage, Robert G. Parish, Kurt Lange, Robert Samson, Thomas Lowe, and Tony Jacobson (collectively "Directors"). On information and belief, Thomas G. Hudson, Richard Gage, and Joseph Caldwell were members of MPS's board of directors as of the timeframes at issue in this Complaint.

24.     Plaintiffs are unaware of the true names of defendants Does 1 through 10, inclusive, and have therefore sued them by the foregoing names which are fictitious. Plaintiffs will amend this Complaint by inserting true names in lieu of said fictitious names, together with apt and proper charging words, when said true names are ascertained. Plaintiffs are informed, believe, and thereon allege that each of the defendants designated herein as Doe are, and at all times relevant were, directors, officers, shareholders, and/or investors in MPS. Plaintiffs are informed and believe and thereon allege that each of the defendants designated herein as Doe is responsible and liable to Plaintiffs in some manner for the events, happenings, and

contentions referred to in this Complaint, and that Plaintiffs' injuries as herein alleged were proximately caused by said Doe defendants. All references herein to "Defendant" shall be deemed to include all Doe defendants. Defendant Doe #1 is hereby designated as a member of the MPS board of directors who was active on or around December 19, 2012, whose name is unknown to Plaintiffs at this time.

25.     On or about February 9, 2010, MPS co-founder Joe Caldwell initiated discussions with Plaintiffs for the sale, transfer, and assignment of the rights, title, and interest in 49% ownership of the Intellectual Property. Plaintiffs also entered into a license agreement with MPS for the remaining 51% of the Intellectual Property.

26.     Between 2010 and 2012, Plaintiffs and MPS entered into each of the following agreements and amendments:

a. Sale and Assignment of All Patents and Patents Pending agreement dated April 1, 2010 (the "**Original Agreement**") (Exhibit 1);

b. First Amendment to Sale and Assignment of All Patents and Patents Pending Agreement and Estoppel Certificate dated August 2, 2011 (the "**First Amendment**") (Exhibit 2);

    c. Patent Exclusive License Co-Ownership and Purchase agreement dated on or about March 12, 2012 (the "**Patent License**") (Exhibit 3);

    d. Second Amendment to Sale and Assignment of All Patents and Patents Pending Agreement dated March 16, 2012 (the "**Second Amendment**") (Exhibit 4); and

    e. Binding letter agreement dated October 12, 2012 (the "**Binding Letter Agreement**") (Exhibit 5);

(collectively, the "**IP Agreements**").

27. Under the IP Agreements, if and when MPS defaulted on any of its obligations, Plaintiffs were required to provide written notice to MPS specifying the nature of the default. MPS then had thirty days after receipt of the notice to cure the default.

28. Plaintiffs' Intellectual Property became a crucial component of MPS's development of advanced parking meters. The MPS parking meters are connected devices with built-in touchscreens for ease of use, cameras that capture real-time data about drivers and their parking behavior, and mobile navigation that uses the internet to aid drivers in quickly finding a place to park their vehicle.

29. MPS's meters and parking system fall within the scope of the Intellectual Property licensed to MPS under the IP Agreements.

30.     MPS has affirmatively utilized Plaintiffs' Intellectual Property in the development of their parking meters.

### A.     Breach of Contract

31.     In the spring of 2014, Plaintiffs became aware that MPS was breaching the IP Agreements, by, among other things, failing to pay owed monthly royalty payments. Accordingly, on or about May 29, 2014, Plaintiffs, through their former counsel, Quantum Law, sent MPS a Notice of Default (the "**2014 Notice of Default**").

32.     Subsequently, MPS resumed paying the monthly royalty payments it owed to Plaintiffs. Additionally, MPS promised multiple times that it would cure all outstanding defaults, but has failed to do so as of the date of this filing.

33.     MPS has also failed to cure any of its other ongoing defaults of the IP Agreements, which are set forth in further detail below.

34.     MPS's multiple defaults (the "Defaults") of the IP Agreements include:

### 1.     Failure to Make Minimum Monthly Payments of $30,000 on the Original Agreement

35.     The Original Agreement provided MPS with title and interest to Plaintiffs' intellectual property in exchange for monthly royalty payments

which were allocated toward a maximum total of $130,000,000.00 (the "Total Royalty Payment").

36.     The monthly royalty owed to Plaintiffs increased over time after certain conditions were met.  At the time of execution, Section 3(vii) set the royalty rate as follows:

> Upon the earlier to occur of (a) October 1, 2010 or (b) the date when the revenue of MPS generated from parking meters utilizing the Intellectual Property meets or exceed[s] $60,000.00 per month, MPS shall increase the royalty payment from $2,000.00 per month to $15,000.00 per month for the next six months. . . .

37.     At that point, Section 3(viii) of the Original Agreement states:

> Commencing on April 1, 2011, MPS agrees to increase the royalty payment to the greater of (a) $20,000.00 per month, or (b) 3% of the gross operating income of MPS. . . .

38.     The monthly royalty payments then increased a final time per the Original Agreement. Section 3(ix) states:

> Commencing on April 1, 2012, MPS agrees to increase the royalty payment to the great of (a) $30,000.00 per month or (b) 3% of the gross operating income of MPS. . . .

39.     Section 3(xvi) of the Original Agreement memorializes the $130,000,000 maximum as follows:

> The Payments set forth herein shall continue until such time as the IP Owners have been paid a total of $2,000,000.00. Once the $2,000,000.00 threshold has been reached, then the only payment to be made by MPS is a royalty payment in the amount of 3% of the gross operating income of MPS, plus $300.00 for each new installed parking

meter utilizing the Intellectual Property until a total of 130,000,000 has been paid to the IP Owners or until such time as all of the patents have expired, whichever occurs first (the 'Terminating Event'). When the Terminating Event has occurred, all payments shall terminate.

40.     Section 6 of the First Amendment further confirms the total $130,000,000.00 in royalty payments. It provides as follows:

If it is determined that MPS is at fault for the expiration of a patent, that valuation shall be added to the $130,000,00.00 total royalty payment due to the [Plaintiffs], payable as outlined in the [Original] Agreement, as amended.

41.     On information and belief, all conditions precedent for the above monthly royalty payments were met, and MPS owed Plaintiffs monthly royalty payments of $30,000 by April 1, 2012.

42.     On October 12, 2012, Plaintiffs and MPS entered into the Binding Letter Agreement, which modified the monthly royalty payment. Section 13 of the Binding Letter Agreement titled "Future Royalties," reduced MPS's obligation to pay Plaintiffs the minimum monthly royalty payment from $30,000 to $15,000.00 until the condition precedent set out in Section 5 of the Original Agreement was met. Section 5 of the Original Agreement reads as follows:

In the event the related transaction between Global Parking Enforcement Technologies ("GPET") and MPS fails to be completed for any reason, then this Sale and Assignment shall continue to be effective until terminated by MPS, as determined in its sole discretion, but all

payments shall cease with the exception of the a [sic] monthly payment equal to 50% of the royalty payment then currently in effect as set forth in Section 3 and the payment described in Section 3(xi). Upon completion of the requirements of the GPET contract by either GPET or MPS, all royalty payments set forth in Section 3 shall resume.

43.   This condition precedent was subsequently met, and in or around June 2014, MPS confirmed that its minimum monthly payment was readjusted to $30,000.00 beginning July 1, 2014.

44.   This minimum-monthly-payment arrangement is reflected in MPS's 2014 audited financial statements.

45.   MPS has failed and continues to fail to pay its ongoing royalty obligation of either: (1) the minimum monthly royalty payment of $30,000.00 toward the $130,000,000.00 total royalty; or (2) the 3% of MPS's gross operating income, whichever is greater, for each month since June 1, 2016.

## 2.    Failure to Provide Independent Auditor's Report Pursuant to Section 9 of the Patent License

46.   Section 9 of the Patent License provided Plaintiffs with audit rights as follows:

Audit Rights – [Plaintiffs], their independent Chartered Accountants or other duly authorized agents, shall have the right during normal business hours, and upon reasonable advance notice, and not more than once per calendar year, to examine and make copies of the books, records and tax returns of [MPS] to confirm the accuracy of consideration due, and [MPS] agrees to keep complete and accurate books and records of its operation of the business. In addition, the

> [Plaintiffs] shall be provided with a report prepared by
> [MPS's] Independent Auditors stating, for the Licensed
> Products, the number of units sold, payments received, the
> royalty paid within 90 days of each year end.

47.     On information and belief, MPS has repeatedly breached section

9 of the Patent License by failing to provide Plaintiffs with accurate

independent auditor reports.

### 3.     Failure to Pay Additional Royalty Amounts

48.     Pursuant to Section 3(x) of the Original Agreement, MPS agreed

to pay Plaintiffs, in addition to the royalties set forth above, "$300.00 for each

new and installed parking meter utilizing the Intellectual Property."

49.     MPS failed to disclose the number of new meters installed and

manufactured subsequent to the execution/effective date of the IP Agreement.

50.     On information and belief, within the past 12 to 24 months, MPS

has installed between 500 and 1,500 new parking meters. It has failed and

refuses to pay the royalty fees for same. The exact number of installed meters

cannot be ascertained due to MPS's refusal to provide Plaintiffs reports

required pursuant to the Patent License agreement.

51.     As a result, on information and belief, MPS owes Plaintiffs

between $150,000.00 and $450,000.00 in royalty payments for newly installed

meters that MPS failed to report.

**4.   Failure to Fulfill its Obligations Relating to its Acceptance of New Private Placements and/or Equity Investments**

52.   Pursuant to Section 3(xvi) of the Original Agreement, Plaintiffs are entitled to participate in any private placements less than $5,000,000.00 on a pro-rata basis. In the event MPS offered to any party a private placement opportunity, it was required to provide Plaintiffs the ability to participate in same on a pro rata basis.

53.   In Section 16 of the Binding Letter Agreement, MPS modified this obligation by agreeing to notify Plaintiffs in writing of the closing or completion of any future private placements or other equity investments made in MPS within three (3) business days of any such closing or completion.

54.   Additionally, per Section 3(xi) of the Original Agreement:

> MPS will also pay [plaintiffs] an additional $500,000.000 payable by (a) sharing 50% of any monthly net operating income generated from parking meters utilizing the Intellectual Property in excess of $50,000.00 per month (includes the deduction of any royalty payment as described herein or any payment owed to GPEC under separate agreement) or (b) the contribution of 5% of any third party investment money, or any combination thereof.

55.   On information and belief, MPS raised capital by way of a sale of options, and breached Section (xi) by failing to make the required payments up to $500,000, causing damages to Plaintiffs.

13

     **5.**     **Failure to Carbon-Copy Plaintiffs on All Correspondence Pursuant to MPS's Obligation to Provide Access to Patent Files and Information**

56.    Pursuant to Section 15 of the Binding Letter Agreement:

> MPS covenants that the terms of any engagement of a law firm in connection with the Patent Portfolio (as defined in the Binding Letter Agreement) shall include an acknowledgment by such law firm that [Plaintiffs] will have full access to the legal files and records related thereto . . . Further, any such law firm will be required to carbon copy the [Plaintiffs] any correspondence that is sent to or received form the USPTO or the CIPO. MPS covenants that it will also carbon copy [Plaintiffs] on any correspondence that it sends or forwards to the new law firm in connection with the Intellectual Property. In the event MPS fails to make any payment required to renew a patent on or before the third business day before such payment is due, then [Plaintiffs] shall have the right to make such payment on MPS's behalf and to instruct the law firm to renew such patent. MPS shall reimburse [Plaintiffs] for the amount of such payment no later than ten (10) days after receipt of written notice from [Plaintiffs] that such payment was made on their behalf along with such proof of payment.

57.    MPS failed to carbon copy Plaintiffs on all correspondence that it sent, forwarded to, or received from the new law firm in connection with the Intellectual Property, despite explicit acknowledgement from MPS's patent attorney of its ongoing obligation to do so. Further, Plaintiffs were not carbon-copied on any correspondence received from the USPTO, the CIPO, or any other patent office of the licenses or patents by MPS's patent lawyers. Lastly, Plaintiffs have been previously denied access to the legal files and records related to the Intellectual Property.

14

58.    MPS's failure to meet its ongoing obligation to keep Plaintiffs informed of the status of the Intellectual Property prevented Plaintiffs from exercising their rights under the IP Agreements to be indemnified by MPS for the costs of maintaining the patents and applications contained within the Intellectual Property.

### 6.    Failure to Provide Confirmation that Each Unit of Licensed Product Bore a Patent Notice

59.    Pursuant to Section 40 of the Patent License, MPS must place in a conspicuous location on each unit of Licensed Product sold by it a permanent label or a plate bearing a patent notice conforming to the statutes in force in the jurisdictions into which it is reasonably foreseeable that it may be installed, relating to the marking of the patented articles.

60.    On information and belief, MPS violated the foregoing provision by failing to include such labels.

### 7.    Failure to Maintain All Properties in the Patent Portfolio in Good Standing

61.    The IP Agreements required MPS to maintain the Intellectual Property.

62.    Pursuant to Section 16 of the Patent License, MPS was required to prepare, file, prosecute, and maintain all of the patents contained in the Intellectual Property in the manner set forth in the IP Agreements.

63.    Pursuant to Section 6 of the First Amendment:

> If any of the Intellectual Property included in the [Original] Agreement has expired or expires and is unable to be recovered, then an independent third party shall be retained to evaluate cause and fault for such expiration of the patent or patent/patent application, as well as the value of such lost patents to the IP Holders.

64.    On information and belief, MPS has failed to properly maintain a number of patents subject to the Patent License Agreement, which in turn reduced the value of the Intellectual Property.

### 8.    Failure to Bind Any and All Third-Party Investors in MPS's Business to the Term of the Sale and Assignment Terms of the IP Agreements

65.    Pursuant to Section 6 of the Original Agreement, MPS must ensure that any third-party investor in MPS is bound by the term of the Original Agreement's sale and assignment provision.

66.    Upon information and belief, MPS further defaulted under the parties' agreements by failing to bind MPS's third-party investors to the terms of the Original Agreement.

### 9.    Notice of Default and Failure to Cure

67.    On or about July 25, 2016, Plaintiffs, through their prior legal counsel, sent to MPS a six-page Notice of Default Letter (the "2016 Notice of Default"), outlining all of the aforementioned defaults (the "Defaults"). The 2016 Notice of Default constituted proper and reasonable notice of MPS's defaults, as required by terms of the IP Agreements.

16

68.     The 2016 Notice of Default specifically outlined the nature and grounds for each specific default and referred to each of the specific terms in the IP Agreements which MPS breached. It also outlined the action required to cure each default and requested that MPS cure the Defaults and comply with its obligations under the IP Agreements within 30 days.

69.     Any potential Defaults described were due to MPS having failed and refused to provide Plaintiffs with the information they required to determine, with certainty, the extent of MPS's breaches of the agreements.

70.     MPS has made no effort to cure the Defaults since its receipt of the Notice of Default. All Defaults continue to this day.

**B.     Shareholder Oppression**

71.     On December 19, 2012, MPS Chief Executive Officer Tom Hudson sent an e-mail to Plaintiffs informing them that MPS was completing the first phase of its capital formation. The email informed its recipients that MPS was looking to purchase back MPS shares from a founder.

72.     In a masked gesture of good will, Hudson claimed a founder has asked MPS to purchase back his or her shares, and that as a result MPS was offering *all* founders the opportunity to sell back their shares to the corporation at a price of $0.10 per share. The board of directors authorized any purchase of a founder's shares in increments of no less than 250,000 shares.

73.     On information and belief, no founder had asked MPS to buy back his or her shares, and Hudson was using that misrepresentation as a ruse to establish trust.

74.     The email also suggested urgency, noting that the offer was open for a limited time and the price offering must be agreed to by year end. This meant that any founders interested in selling their common shares back to MPS had a mere 12 days to decide.

75.     Around this time, MPS intentionally misrepresented to Plaintiffs that it had no intention to go public, or to provide any further liquidity to shareholders for the next five years. Plaintiffs are informed and believe at the time MPS made these representations to Plaintiffs that the representations were false, as Defendants intended to both buy back and sell shares through private placements.

76.     In reliance on MPS's misrepresentations, Plaintiffs accepted Hudson's offer and sold their shares back to MPS. Michael sold 500,000 of MPS's common shares in January 2013 for $0.10 per share, and another 125,000 shares in June 2013 for $0.15 per share. Fred sold 750,000 of MPS's common shares in March 2013 for $0.20 per share, and a further 500,000 of MPS's common shares in June 2013 for $0.23 per share. Jason sold 250,000 of MPS's common shares in September 2013 for $0.29 per share.

77.     Shortly following these transactions, MPS offered the shares for $2.00 per share. This amounted to between ten and twenty times the price paid to Plaintiffs. Given the number of shares sold during the sale, which totaled 1,900,000 shares, MPS made more than $5,000,000.00 profit on the re-sale of Plaintiffs' shares.

78.     Plaintiffs have suffered significant financial harm as a result of MPS's fraudulent conduct.

## V.   Claims for Relief

### Claim I
### Breach of Contract
### (Against Defendant MPS)

79.     Plaintiffs repeat the allegations set forth in paragraphs 1 through 78 and incorporate them by reference herein.

80.     Between 2010 and 2012, Plaintiffs and MPS entered into the IP Agreements for the sale, transfer, and assignment of Plaintiffs' rights, title, and interest in 49% ownership of the Intellectual Property. Among other things and in exchange for these rights, MPS agreed it would compensate Plaintiffs with royalties and other payments and otherwise comply with the provisions in the IP Agreements, as set forth in further detail above.

81.     Plaintiffs have fully complied with their obligations under the IP Agreements, or are excused from performing their obligations due to the actions and/or inactions of MPS.

82.     MPS has breached the IP Agreements, and although Plaintiffs have provided MPS with multiple opportunities to cure its breaches of the IP Agreements, MPS has failed to do so.

83.     Plaintiffs have suffered damages as a direct and proximate result of MPS's breach of the IP Agreements.

84.     Plaintiffs are entitled to an award of damages for MPS's breaches in an amount to be proven at trial.

### Claim II
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Defendant MPS)

85.     Plaintiffs repeat the allegations set forth in paragraphs 1 through 78 and incorporate them by reference as though fully set forth herein.

86.     Plaintiffs and defendant MPS were in multiple contractual relationships pursuant to the IP Agreements. Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contracts.

87.     Plaintiffs have fully complied with their obligations under the IP Agreements, or are excused from performing their obligations due to the actions and/or inactions of MPS.

88.     MPS has repeatedly, wrongfully and intentionally breached its duty of good faith and fair dealing by denying the Plaintiffs the benefits to

which they were entitled under the IP Agreements, as set forth in further detail above.

89.    Plaintiffs have suffered damages as a direct and proximate result of MPS's breaches of the covenant of good faith and fair dealing.

## Claim III
## Violation of Minn. Stat. § 302A.751
## (Against All Defendants)

90.    Plaintiffs repeat the allegations set forth in paragraphs 1 through 78 and incorporate them by reference as though fully set forth herein.

91.    Plaintiffs were minority shareholders in MPS.

92.    Defendant MPS and its directors acted fraudulently or illegally toward Plaintiffs in Plaintiffs' capacities as shareholders of MPS in violation of Minn. Stat. § 302A.751, subd. 1(b)(2).

93.    Defendant MPS and its directors acted in a manner unfairly prejudicial to Plaintiffs in Plaintiffs' capacities as shareholders of MPS in violation of Minn. Stat. § 302A.751, subd. 1(b)(3).

94.    As a direct and proximate result of Defendants' violations of Minn. Stat. § 302A.751, subds. 2 and 3, Plaintiffs have been deprived of the benefits of ownership of their shares of MPS's common stock and shareholder distributions.

95.    Plaintiffs accordingly are entitled to equitable relief pursuant to Minn. Stat. § 302A.751, subds. 1 and 3a in the form of an order directing

MPS and its directors to compensate Plaintiffs for the fair value of their common-stock interest in MPS.

96.     Plaintiffs accordingly are entitled to equitable relief pursuant to Minn. Stat. § 302A.751, subds. 1 and 3a in the form of an order directing MPS and its directors to pay Plaintiffs distributions.

97.     Because MPS and its directors have acted in bad faith, Plaintiffs are also entitled to an order requiring MPS and its directors to pay Plaintiffs their reasonable expenses, including attorneys' fees and disbursements, pursuant to Minn. Stat. § 302A.751, subd. 4.

**Claim IV**
**Direct Shareholder Action Based Violation of Minn. Stat.**
**§ 302A.471(4)**
**(Against All Defendants)**

98.     Plaintiffs repeat the allegations set forth in paragraphs 1 through 78 and incorporate them by reference as though fully set forth herein.

99.     Defendant corporation MPS and its directors took fraudulent corporate action with regard to Plaintiff shareholders, in violation of Minn. Stat. § 302A.471(4). Under this provision, a shareholder of a Minnesota corporation is entitled to bring a direct action alleging that a corporate action was fraudulent with respect to that shareholder.

100.    Plaintiffs have suffered damages as a direct and proximate result of MPS's and the directors' violations of Minn. Stat. § 302.471(4).

101.   Plaintiffs are entitled to an award of damages for MPS's

statutory violations in an amount to be proven at trial, including an award of

their reasonable attorneys' fees and disbursements pursuant to Minn. Stat.

§ 302.471(4), and any equitable relief that the court deems just and

reasonable.

## Claim V
## Shareholder Breach of Fiduciary Duty
## (Against Defendants Carter, Caldwell, Evenstad, Gage, Hudson, Jacobson, Lange, Lowe, Parish, Samson, and Does 1 through 10)

102.   Plaintiffs repeat the allegations set forth in paragraphs 1 through

78 and incorporate them by reference as though fully set forth herein.

103.   MPS has and had at all relevant times fewer than 35

shareholders and is therefore a closely-held corporation pursuant to Minn.

Stat. § 302A.011(6a).

104.   Defendant individuals are shareholders who are or were

registered on the books or records of MPS or its transfer agent or registrar as

the owner of whole or fractional shares of the corporation pursuant to Minn.

Stat. § 302A.011(29).

105.   As shareholders of MPS, Defendant individuals owed the other

shareholders, Plaintiffs, a fiduciary obligation to act with the highest

standards of integrity and good faith in their dealings with each other and to

deal openly, honestly, and fairly with them. As shareholders, Defendant

23

individuals also had a "duty to disclose material information about the corporation."

106.   Defendant individuals breached that duty by, among other things, acting in bad faith by convincing Plaintiffs to sell their MPS shares back to MPS based upon knowingly false representations, in violation of Minn. Stat. §80A.68.

107.   In acting as alleged above, Defendant individuals breached their fiduciary duties to Plaintiffs as co-shareholders.

108.   As a direct and proximate cause of Defendant individuals' breaches of fiduciary duty, Plaintiffs have been harmed in an amount to be proven at trial.

109.   The breaches of fiduciary duty were willful and malicious.

**Claim VI**
**Director Breach of Fiduciary Duty**
**(Against Defendants Carter, Caldwell, Evenstad, Gage, Hudson,**
**Jacobson, Lange, Lowe, Parish, Samson, and Does 1 through 10)**

110.   Plaintiffs repeat the allegations set forth in paragraphs 1 through 78 and incorporate them by reference as though fully set forth herein.

111.   MPS has and had at all relevant times fewer than 35 shareholders and is therefore a closely-held corporation pursuant to Minn. Stat. § 302A.011(6a).

112.   Defendants are each directors because each of them was or is a member of MPS' board of directors. See Minn. Stat. § 302A.011, subd. 9.

113.   As directors of MPS, Defendants each had a fiduciary duty to "discharge the duties of the position of director in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." Minn. Stat. § 301A.251.

114.   This fiduciary duty was owed to Plaintiff shareholders.

115.   Defendants each breached that duty by, among other things, making bad faith representations to Plaintiffs to convince them to sell their MPS shares back to MPS in violation of Minn. Stat. §80A.68.

116.   Defendants' actions constitute a breach of their fiduciary duties to Plaintiffs.

117.   As a direct and proximate cause of Defendants' breaches of fiduciary duty, Plaintiffs have been harmed in an amount to be proven at trial.

118.   The breaches of fiduciary duties were willful and malicious.

## Prayer for Relief

Wherefore, Plaintiffs ask this Court to:

1.   Enter judgment for Plaintiffs on all claims;

2.   Award damages to Plaintiffs in an amount to be determined at trial;

1.    Require repayment of all disbursements that Defendants improperly

      received as a result of Defendants' misconduct;

2.    Award Plaintiffs their attorneys' fees; and

3.    Award interest, costs, fees, and further relief as the Court may deem

      proper.

### Jury Demand

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: March 28, 2018            **GREENE ESPEL PLLP**


                                 *s/Faris Rashid*
                                 Matthew D. Forsgren, Reg. No. 0246694
                                 Faris A. Rashid, Reg. No. 0391508
                                 222 S. Ninth Street, Suite 2200
                                 Minneapolis, MN 55402
                                 mforsgren@greeneespel.com
                                 frashid@greeneespel.com
                                 (612) 373-0830

                                 Attorneys for Plaintiffs